UNITED STATES of America,
Plaintiff-Appellee,

v.

Gloria SALDARRIAGA–MARIN, Marina Hoyos Gomez Del Soccorro, Mario Valencia-Acero, Defendants-Appellants.

No. 83–5005
Non-Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

June 22, 1984.

Alan I. Karten, Miami, Fla., for Saldarriaga-Marin.

Rick S. Cullen, Asst. Federal Public Defender, Miami, Fla., for Del Soccorro.

Ana-Maria Carnesoltas (court-appointed), Miami, Fla., for Valencia-Acero.

Stanley Marcus, U.S. Atty., Linnea Johnson, James G. McAdams, III, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HILL, JOHNSON and HENDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

After a nonjury trial in the District Court for the Southern District of Florida, appellants were convicted of possession with intent to distribute cocaine and importation of cocaine. They bring the present appeal challenging the district court's denial of their motion to suppress the cocaine. Finding no error, we affirm.

As an initial matter, we note that the issues raised by appellants have largely been resolved by this court's recent decisions in *United States v. Vega-Barvo*, 729 F.2d 1341 (11th Cir.1984); *United States v. Padilla*, 729 F.2d 1367 (11th Cir.1984); *United States v. Pino*, 729 F.2d 1357 (11th Cir.1984); *United States v. Henao-Castano*, 729 F.2d 1364 (11th Cir.1984); *United States v. Mosquera-Ramirez*, 729 F.2d 1352 (11th Cir.1984); *United States v. Castaneda-Castaneda*, 729 F.2d 1360 (11th Cir.1984); and *United States v. De Montoya*, 729 F.2d 1369 (11th Cir.1984). Together, those cases establish that the reasonable suspicion standard governs the fourth amendment constitutionality of x-ray tests used to determine whether persons entering the United States are carrying narcotics in their bodies. *See Vega-Barvo*, at 1344–1349.[1]

With respect to all three appellants, we have no difficulty in concluding that Customs officials had reasonable suspicion that each was carrying narcotics. Appellants all arrived in Miami on a flight that had originated in Bogata, Colombia. Shortly after arrival, a passenger on the same flight was questioned and she admitted to a Customs agent that she had swallowed fifty pellets containing cocaine. At about the time of that arrest, Appellant Marin was selected for secondary inspection because she was wearing a party dress, which the agents considered to be unusual travel attire. Her ticket reflected a purchase date and place identical to that of the passenger already in custody. Too, Marin's ticket number ended in 116; the arrested passen-

---

1. The decisions cited above, as well as the case before this court, all involve circumstances under which Customs agents observed persons entering into the United States and, for various reasons, came to suspect those persons of concealing *contraband* in their bodies. Critical to the standards applicable to all border search cases, however, is the inherent right of the sovereign to decide who and what will be allowed to pass through its boundaries. As the Supreme Court characterized the distinction between border inspections and other searches:

It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. *Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.*

*Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) (emphasis added).

Thus, it may be that the reasonable suspicion standard does not require Customs officials to suspect a foreign traveler of concealing *contraband.* It may be sufficient that Customs reasonably believes that it has not seen something which the traveler seeks to bring into the country. *Cf. United States v. Ramsey,* 431 U.S. 606, 620, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977) ("The border-search exception [to fourth amendment protections] is grounded on the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country."). We need not decide that question, however, because, as we hold above, the Customs agents here had reasonable suspicion that each of the appellants was concealing narcotics in their bodies.

ger's ticket number ended in 113. When questioned, Marin told the Customs inspectors that she intended to visit a relative in Los Angeles, but she did not have an address, telephone number, or any other information about that relative. Marin indicated that she would be staying at the Hotel Alexandria in Los Angeles during her visit to the United States.

A Customs inspector then checked Appellant Valencia's ticket and learned that it had been purchased at the same time and place as Marin's and the arrested passenger's. Valencia's ticket ended in 115 and her travel itinerary matched that of Marin and the arrested passenger. When asked to explain his trip to the United States, Valencia started breathing heavily and became nervous and fidgety. He told Customs officials that he worked as an economist, yet he could not explain what an economist did or where he worked. Like Marin, Valencia indicated that he would be staying at the Hotel Alexandria in Los Angeles while in the United States.

At this time, Appellant Hoyos had passed through the Customs inspection area and had boarded her connecting flight for Los Angeles. She was discovered by a Customs officer who boarded the plane and began checking tickets for one ending in 114. The officer found that Hoyos' ticket ended in 114, was purchased at the same time and place as those of Marin, Valencia and the arrested passenger, and contained an identical flight itinerary. Appearing nervous as Customs agents began questioning her, Hoyos answered the officers' inquiries by stating that she planned to visit her sister in California, but she could not provide her sister's address or phone number, or any other information about her sister.

Appellants were then taken to secondary inspection areas and individually advised of their rights in Spanish. Each acknowledged their understanding. When further questioning by the Customs agents failed to allay their suspicions, the officers asked each of the appellants to submit to an x-ray examination. At that time, each agreed in writing to submit to the x-ray. Appellants were next taken to a nearby hospital where they signed medical release forms and were administered x-ray exams. The x-rays showed foreign objects in the digestive tracts of Valencia and Hoyos. Marin's x-rays were inconclusive;[2] however, she took a laxative and soon expelled latex-wrapped containers filled with what proved to be cocaine. Several hours later, both Valencia and Hoyos also expelled packages containing cocaine. Based on this evidence, appellants were indicted and convicted of multiple narcotics violations.

Appellants make several arguments for reversing their convictions. Primarily, appellants contend that they did not "freely and voluntarily" consent to the x-ray exams that revealed hidden objects in their stomachs. Absent "free and voluntary" consent, appellants maintain, the x-ray procedures violate the fourth amendment proscription against warrantless searches, and any evidence so obtained should have been suppressed. Appellants also challenge the level of suspicion required to support the x-ray searches conducted here and the validity of their continued detentions while Customs agents carried out these detection procedures. Finally, Appellant Marin attacks the legality of the hospital staff's actions in administering a laxative after her x-rays proved inconclusive.

 We are not persuaded by the arguments appellants advance. Their attack on the validity of the consent obtained by the medical personnel who administered the x-rays presumes the constitutional necessity of "free and voluntary" consent. Of course, a warrantless search can be conducted pursuant to "free and voluntary" consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). The x-ray procedures challenged here, however, are not searches to which "free and voluntary" consent must be given because Customs agents, possessing reasonable suspicion, do

2. The x-rays neither confirmed nor dispelled the officers' suspicions.

not need the consent of one entering the United States to detain and search for contraband. We recently rejected a similar argument in *United States v. Pino,* where we held:

> Once a particularized suspicion arises that you are an internal carrier, the agents can conduct a search sufficient to determine the accuracy of that suspicion, the type of search depending in part on what you consent to. In the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions. This is the reason, in our judgment, that the cases should not rest solely on whether there was a consent or waiver in a particular case. Consent may heavily influence the determination as to the reasonableness of the manner of the search, but it does not completely foreclose the question of whether it was constitutional to search in some manner.

*Pino,* at 1360. Thus, once reasonable suspicion has been established, Customs agents can transport the suspected carrier to a hospital for an x-ray exam that is not physically forced, regardless of whether the carrier has "freely and voluntarily" consented to the exam. *See Vega-Barvo,* at 1344 (where search based on reasonable suspicion and x-ray not physically forced, consent is not an issue).

Similarly, any suggestion that more than reasonable suspicion is required to support an x-ray search is foreclosed by our decisions in *Vega-Barvo, Padilla, Pino, Henao-Castano, Mosquera Ramirez, Castaneda-Castaneda,* and *De Montoya.* Employing the reasonable suspicion standard adopted by those decisions, *see e.g., Vega-Barvo,* at 1349, we have already concluded that the Customs agents in this case were justified in suspecting that each of the appellants was an internal carrier of narcotics. Moreover, since Customs agents, possessing reasonable suspicion that one entering the United States is an internal carrier, are permitted to detain that person "until nature reveals the truth or falsity of their suspicions," *Pino,* at 1360, appellants cannot complain that they were unlawfully detained while Customs officials inspected their baggage, transported them to the hospital for x-rays, and held them until their fecal matter could be examined.

Finally, Appellant Marin challenges the lawfulness of her detention and search on the ground that the hospital staff, acting as agents of the Customs officers, acted outside the scope of any authorization she had given when they gave her a laxative. Marin does not allege that she was in any way forced to take the laxative. Rather, she agreed to ingest the laxative just as she agreed to the x-ray search. Once the Customs officers developed reasonable suspicion that Marin was an internal carrier, they could permit nature to run its course or ask Marin to speed up the process by taking the laxative. The fourth amendment erects no bar to either procedure so long as neither is physically forced on the suspected carrier. *See Pino,* at 1359–60.

For these reasons, we hold that the district court correctly denied appellants' motions to suppress.

AFFIRMED.